**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DISABILITY RIGHTS NEW YORK

        Plaintiff,

    -against-

NEW YORK STATE, UNIFIED COURT SYSTEM OF
THE STATE OF NEW YORK, Honorable JANET
DIFIORE, as Chief Judge of the New York State
Unified Court System, Honorable LAWRENCE K.
MARKS, as Chief Administrative Judge of the New
York State Unified Court System.

        Defendants.

No. 16 Civ. 7363 (AKH)

---

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

DISABILITY RIGHTS NEW YORK
725 Broadway
Albany, New York 12207
(518) 432-7861
Attorneys for Plaintiff

# TABLE OF CONTENTS

TABLE OF AUTHORITIES -------------------------------------------------------------------------- ii

PRELIMINARY STATEMENT ------------------------------------------------------------------- 1

LEGAL STANDARD -------------------------------------------------------------------------------- 1

ARGUMENT ------------------------------------------------------------------------------------------ 2

I.   THE COURT CANNOT ABSTAIN UNDER YOUNGER V. HARRIS -------------------- 2

II.  DRNY'S SECTION 1983 CLAIMS AGAINST CHIEF JUDGE JANET DIFIORE AND
     CHIEF ADMINISTRATIVE JUDGE LAWRENCE K. MARKS ARE NOT BARRED
     BY THE DOCTRINE OF SOVEREIGN IMMUNITY. ------------------------------------- 8

III. THE COMPLAINT PLAINLY STATES A CLAIM THAT 17A VIOLATES THE
     EQUAL PROTECTION CLAUSE------------------------------------------------------------12

     A.  Plaintiff Successfully Pleads an Equal Protections Violation -------------------------12

     B.  Plaintiff Plausibly Alleges Defendants Purposefully Discriminate Against Individuals
         with Intellectual and Developmental Disabilities -----------------------------------------16

IV.  THE COMPLAINT ALLEGES VIOLATIONS OF THE ADA AND
     REHABILITATION ACT ------------------------------------------------------------------17

     A.  Qualified Individuals with Intellectual and Developmental Disabilities------------------18

     B.  Defendants Are Public Entities Subject to Title II of the ADA and Section 504 -------- 19

     C.  The Article 17A Guardianship Process is a Service, Program or Activity----------------19

     D.  Defendants Discriminate By Denying the Benefit of a Program--------------------------21

     E.  Animus or Comparation Class is Not Required for Plaintiff's ADA and Section 504
         Claims--------------------------------------------------------------------------------------22

     F.  The State's Prior Statements Find That Article 17A Violates the ADA ------------------25

V.   PLAINTIFF HAS SUFFICIENTLY PLEADED A FACIAL CHALLENGE TO
     ARTICLE 17A ----------------------------------------------------------------------------27

VI.  CHIEF JUDGE DIFIORE AND CHIEF ADMINISTRATIVE JUDGE MARKS ARE
     NOT ENTITLED TO QUALIFIED IMMUNITY ----------------------------------------31

CONCLUSION ----------------------------------------------------------------------------------34

# TABLE OF AUTHORITIES

CASES                                                                                      PAGE(S)

*Alexander v. Choate,* 469 U.S. 287 (1985) ---------------------------------------------------------22

*Barboza v. D'Agata*, 151 F. Supp. 3d 363 (S.D.N.Y. 2015) --------------------------------------32

*Boddie v. Connecticut,* 401 U.S. 371 (1971) ------------------------------------------------------21

*Bruni v City of Pittsburgh*, 824 F3d 353 (3d Cir 2016)------------------------------------------28

*Cobb v. Beame*, 402 F.Supp. 19 (S.D.N.Y. Sept. 30, 1975)-------------------------------------- 7

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona,*

   915 F.Supp. 2d 574 (S.D.N.Y.2013)-----------------------------------------------------------29

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona,*

   138 F. Supp. 3d 352 (S.D.N.Y. 2015) --------------------------------------------------- 28,29

*Degrafinreid v. Ricks*, 417 F. Supp. 2d 403 (S.D.N.Y. 2006) ---------------------------------- 9

*Denton v. McKee*, 332 F.Supp.2d 659 (S.D.N.Y.2004)-------------------------------------------33

*Dickerson v. Napolitano*, 604 F. 3d 732 (2d Cir. 2010).-------------------------------------------30

*Doe v City of Albuquerque*, 667 F. 3d 1111 (10th Cir 2012) --------------------------------- 28,29

*Ex Parte Young*, 209 U.S. 123 (1908)------------------------------------------------------- 9, 10, 11

*Field Day, LLC v. County of Suffolk*, 799 F. Supp. 2d 205 (E.D.N.Y. 2011) ----------------------33

*Frank v. Relin*, 1 F. 3d 1317 (2d Cir. 1993) -----------------------------------------------------------32

*Gagne v. Maher,* 594 F. 2d 336 (2d Cir 1979), *affd.*, 448 US 122 (1980) --------------------------12

*Gershanow v. Cnty. Of Rockland*, 2014 WL 1099821 (S.D.N.Y. 2014) ------------------------22

*Hamilton v. Fisher*, No. 10–CV–1066, 2012 WL 987374 (N.D.N.Y. Feb. 29, 2012) ------------33

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982).-----------------------------------------------------------32

*Helen L. v. DiDario*, 46 F. 3d 325 (3d Cir. 1995) ------------------------------------------------------24

*In re Chaim A.K.*, 26 Misc. 2d 837 (N.Y. Sur. Ct. N.Y. Cnty. 2009)---------------------------------30

*In re Guardian for Michelle M.*, 52 Misc. 3d 1211(A) (Sur. Ct. Kings Cnty. 2016) --------------13

*In re Guardianship of B.*, 190 Misc. 2d 581 (N.Y. Sur. Ct. Tomkins Cnty. 2002) -----------------14

*In re Guardianship of J. H.*, 27 Misc. 3d 705, 707 (N.Y. Sur. 2010)---------------------------------31

*In re Mark C.H.*, 28 Misc. 765 (N.Y. Sur. Ct. N.Y. Cnty. 2010)---------------------------------------30

*Innovative Health Sys., Inc. v. City of White Plains*, 117 F. 3d 37 (2d Cir. 1997) ------------------19

*Jackler v. Byrne*, 658 F. 3d 225 (2d Cir. 2011) -----------------------------------------------------------32

*Kentucky v. Graham,* 473 U.S. 159 (1985) ------------------------------------------------------- 12, 32

*Loeffler v. Staten Island Univ. Hosp.*, 582 F. 3d 268 (2d Cir.2009) --------------------------------25

*Looney v. Black*, 702 F. 3d 701 (2d Cir.2012) ------------------------------------------------------------33

*Maloney v. Cnty. of Nassau*, 623 F. Supp. 2d 277 (E.D.N.Y.2007) ---------------------------------33

*Matthews v. City of New York*, 889 F. Supp. 2d 418 (E.D.N.Y. 2012) --------------------------------32

*Morales v. State of N.Y.* 22 F. Supp. 3d 256 (S.D.N.Y. 2014)------------------------------------------ 2

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)------------------------------------------- 23, 24

*Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) ------------------------------------------------------19

*Phillips v. Girdich*, 408 F. 3d 124 (2d Cir. 2005)-------------------------------------------------- 16, 17

*Restivo v. Hessemann* 846 F. 3d 547 (2d Cir. 2017) ---------------------------------------------------- 2

*Shechter v. Comptroller of City of New York*, 79 F. 3d 265 (2d Cir. 1996)-------------------------33

*Steffel v. Thompson*, 415 U.S. 452 (1974) ---------------------------------------------------------------- 7

*Taylor v. Vermont Dept. of Educ.*, 313 F. 3d 768 (2d Cir.2002) --------------------------------------33

*Taylor v. Wilde*, No. 11–CV–3608, 2012 WL 2860999 (E.D.N.Y. 2012) --------------------------33

*Tennessee v. Lane*, 541 U.S. 509 (2004);-------------------------------------------------------------9, 22

*Traynor v. Turnage*, 485 U.S. 535 (1988) ------------------------------------------------------------23

*U.S. v. Salerno* 481 U.S. 739 (1987) ------------------------------------------------------------27

*United States v. Decastro*, 682 F. 3d 160 (2d Cir.2012)------------------------------------28

*United States v. Stevens*, 559 U.S. 460 (2010) ------------------------------------------------27

*Vives v. City of New York*, 405 F. 3d 115 (2d. Cir. 2003) ----------------------------------32

*Zellner v. Summerlin*, 494 F. 3d 344 (2d Cir.2007) ------------------------------------------32

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V ------------------------------------------------------------ 1, 11, 29

U.S. Const., amend. XI ------------------------------------------------------------2, 9, 10, 11, 12

U.S. Const., amend. XIV ------------------------------------------------------------1, 9, 11, 17, 28

## STATUTES

29 U.S.C. § 705------------------------------------------------------------18

42 U.S.C. § 1983 ------------------------------------------------------------2,8, 9, 10, 12

Americans with Disabilities Act (ADA) ------------------------------------------ passim

   § 12102------------------------------------------------------------18

   § 12131------------------------------------------------------------18

   § 12188------------------------------------------------------------19

Rehabilitation Act § 504, 29 U.S.C. §794 ------------------------------------------ passim

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12(c) ------------------------------------------------------------ 1

Fed. R. Civ. P. 12(h)(3)------------------------------------------------------------ 1

## REGULATIONS

28 C.F.R. § 35.130 ------------------------------------------------------------24

28 C.F.R. § 42.540(j) ---------------------------------------------------------------------- 20

28 C.F.R. pt. 35, app. A, subpart A --------------------------------------------------------- 20

**S**TATE **S**TATUTES

New York Mental Hygiene Law ("MHL") Article 81 ---------------------------------------- passim

 N.Y. Surrogate's Court Procedure Act ("SCPA") 17-A --------------------------------------- passim

    §§1750, 1750-A-------------------------------------------------------------------------16
N.Y. STAT § 73 ------------------------------------------------------------------------------31
N.Y. STAT § 74 ------------------------------------------------------------------------------31

**O**THER **A**UTHORITIES

Executive Order 84------------------------------------------------------------------------26

Plaintiff Disability Rights New York ("DRNY") respectfully submits this memorandum of law in opposition to Defendants the State of New York (the "State"), the New York State Unified Court System (the "UCS"), Chief Judge Janet DiFiore, and Chief Administrative Judge Lawrence K. Marks (collectively "Defendants") Motion for Judgement on the Pleadings pursuant to Fed. R. Civ. P. 12(c) and 12(h)(3).

## PRELIMINARY STATEMENT

Plaintiff's claims are straightforward. Defendants violate the 5th and 14th Amendment of the Constitution and discriminates under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act against individuals with intellectual and developmental disabilities by terminating all decision making rights without due process or equal protection of the law.

## LEGAL STANDARD

In considering a motion for judgement on the pleadings pursuant to Fed. R. Civ. P. 12(c) a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) The Complaint sets forth all the facts which, if true, make out the asserted causes of action.

Defendants assert that Plaintiff has the burden of demonstrating subject matter standing by a fair preponderance. Memorandum of Law for Defendants (hereinafter Def. Mem.) p. 7. Defendants then assert that the doctrine of sovereign immunity under the Eleventh Amendment bars this suit against the State in federal court. Def. Memo p. 14. The two cases Defendants cite in

support of this dubious rule relate to the seeking of monetary damages or the appealing of state court decisions.[1] Neither *Morales* nor *Restivo* applies to this matter. Plaintiff is seeking non-monetary injunctive relief that is prospective in nature. Since the Defendants are the State, the State's UCS, and its individual officials in their official capacity and the relief sought by Plaintiff is non-monetary injunctive relief, the Southern District Court of New York has subject matter jurisdiction. Taking the claims and relief sought by Plaintiff at their most favorable entails that Plaintiff does not have to prove subject matter standing by a fair preponderance, as the Defendants wrongly assert.

## ARGUMENT

### I.    THE COURT CANNOT ABSTAIN UNDER YOUNGER V. HARRIS

Defendants' assertion that *Younger* abstention doctrine requires this court to abstain from exercising jurisdiction over this case runs contrary to the Supreme Court's recent and explicit reassertion that abstention is the exception and not the rule. *Sprint Communications, Inc. v. Jacobs*, 134 S.Ct. 584, 593 (2013) (hereinafter *Sprint*). The *Spirit* Court makes clear that the *Younger* abstention doctrine does not protect states and their courts from any and all oversight by the federal courts. See *Sprint*, 134 S.Ct. at 593. Federal courts have a "virtually unflagging" duty to rule on cases that are properly before them. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 818 (1976). The exceptions to this duty are extraordinary and narrow, and apply only in the exceptional circumstances in which there is an important countervailing interest

---

[1] *Morales v. State of N.Y.* 22 F. Supp. 3d 256 (S.D.N.Y.) is a case about monetary damages under Title III of the Americans with Disabilities Act. *Restivo v. Hessemann* 846 F.3d 547 (2d Cir. 2017) is a case about monetary damages for wrongful convictions for rape and murder. Neither relate to the manner in which Plaintiff is using §1983 in this litigation.

that would justify it. *Id.*, quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-189 (1959).  Plaintiff's claims do not fall under these narrow exceptions.

There are only three "exceptional" circumstances in which federal courts may abstain: (1) state criminal prosecutions, (2) civil enforcement proceedings, and (3) pending civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.  *Sprint*, 134 S.Ct. 584, 588, 591 (2013) quoting *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 367-368 (1989).  The Defendants' rely exclusively on the third circumstance.

N.Y. Surrogate's Court Procedure Act Article 17A (hereinafter Article 17A) guardianship proceedings are not "pending civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* Instead, the purpose of guardianship proceedings is to protect the respondent against whom the petition is brought.  The Defendants do not use Article 17A to enforce its law and therefore the analogy runs contrary to the examples of civil enforcement actions the Supreme Court cited to in *Sprint*.  Compare *In re Guardianship of Dameris L.,* 956 N.Y.S.2d 848, 854 (N.Y. Sur. 2012) (state's goal in imposing guardianships under Article 17A is to protect people with disabilities from harm) with *Sprint*, 134 S.Ct. at 592 (civil enforcement actions are "characteristically initiated to sanction the party challenging the state action … for some wrongful act.").

Furthermore, petitioners seeking guardianship under Article 17A are private individuals or organizations.  *Compare Sprint*, 134 S.Ct. at 592 ("a state actor is routinely a party to the state proceeding and often initiates the action") with N.Y. Surr. Ct. Proc. Act § 1751 (parties who may make a petition for guardianship under Article 17A include parents of the person with an intellectual or developmental disability; a corporation authorized to serve as a guardian; or any

interested person who is at least eighteen years old).  Therefore, the rationale of allowing states to enforce their own laws that underlies federal courts' duty to abstain from interfering with civil enforcement actions does not apply.

Finally, the present lawsuit does not implicate orders uniquely in furtherance of a state court's ability to perform its judicial functions.  The rationale for abstention in cases involving court orders is to avoid undermining the state's enforcement power.  *Id.* at 13-14.  See *Juidice v. Vail*, 430 U.S. 327, 335 (1977) (Abstention was warranted for civil contempt orders); *Falco v. Justices of the Matrimonial Parts of Sup. Ct. of Suffolk Cty.*, 805 F.3d 425, 428 (2d Cir. 2015) (abstaining where federal plaintiff sought to enjoin state court from collecting fees for court-appointed attorney for his child in family court proceeding); *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12-14 (1987) (state interest in its courts' processes of executing its judgments for money damages are "sufficiently important to justify abstention").  This does not extend to cases concerning the constitutionality of standards and procedures in state court that may result in a court order.

An order of guardianship is not a tool by which Surrogate's court judges can compel or enforce compliance in the way a civil contempt proceeding or the execution of a judgment is.  See *Juidice*, 430 U.S. at 328-330; *Pennzoil*, 481 U.S. at 13-14.  Nor does one enable a court to carry out its functions, such as collecting fees that pay court attorneys for their services where the law requires it.  See *Falco*, 805 F.3d at 428.  Instead, it is a means to the end of ostensibly protecting the best interests of a person with a disability.  See *Dameris L.,* 956 N.Y.S.2d 848, 854 (N.Y. Sur. 2012).  A case challenging Article 17A demonstrably does not fit into the third category of cases that justify *Younger* abstention, in that the cases that exemplify it all concern state courts' enforcement powers rather than the substantive interests they seek to uphold.  See *Sprint*, 134 S.Ct.

at 591, 592, citing *Juidice*, 430 U.S. at 336, n. 12; *Pennzoil*, 481 U.S. at 13; *Falco*, 805 F.3d at 428.

Furthermore, DRNY is not seeking to interfere with a court's pending attempt to enforce any specific order of guardianship under Article 17A. See Complaint at p. 34-35, Disability Rights New York v. N.Y. State et al., 1:16-CV-07363-AKH (S.D.N.Y. Sept. 21, 2016) (hereinafter Compl.). Its primary purpose is to challenge the process by which a surrogate court decides to issue an order of guardianship in the first place. *Id*. at 34. To the extent that granting the requested relief would affect existing orders of guardianship at all, it would be limited to notifying individuals currently under guardianship of their right to request a modification or termination of the guardianship through the new process. *Id.*

The Defendants' reliance upon *Kaufman v. Kaye* is misplaced. Def. Mem. p. 9, quoting *Kaufman v. Kaye*. 466 F.3d 83, 86 (2nd Cir. 2006). The Second Circuit Court's decision in *Kaufman* drew heavily upon the Supreme Court's language and reasoning in *O'Shea v. Littleton*, 414 U.S. 488 (1974), which the Defendants also relies on. *Kaufman*, 466 F.3d at 86-87. In *O'Shea*, the Supreme Court held that the relief sought would result in "continuous or piecemeal interruptions of … state proceedings by litigation in the federal courts." *Id*. at 500. In reaching this conclusion, the Court specifically highlighted that the plaintiff was not challenging the constitutionality of a law or its application nor seeking to enjoin future prosecutions under that law. *Id.* Instead, the requested relief would amount to "an ongoing federal audit" of proceedings under valid state laws. *Id.* This is clearly unlike the relief the Plaintiff seeks in this action. Plaintiff has asserted that Article 17A is neither constitutional nor in compliance with federal civil rights laws. See Compl. ¶¶ 145 -203.

More importantly, granting Plaintiff's requested relief would not require the court to "legislate and engraft new procedures upon existing state … practices." *Kaufman*, 466 F.3d at 86. Plaintiff does not ask this Court to create a new standard of its own.  Instead, Defendants could simply follow the already existing process of Article 81 of the N.Y. Mental Hygiene Law (hereinafter Article 81). Compl. p. 34-35.  There would be no "ongoing federal audit" of how state courts are applying the standard, because a party appealing a Surrogate court's decision could rely on the provisions and state court interpretations of Article 81 without seeking clarification from the federal court.  See *O'Shea*, 414 U.S. at 500.

Because granting an injunction in this case would not undermine the State's ability to enforce its criminal laws, its quasi-criminal laws, or the orders of its courts, there is no basis for abstention under the *Younger* doctrine.  *Sprint*, 134 S.Ct. at 593-594.  Therefore, this Court must render a decision.

Furthermore, *Middlesex County Ethics Comm. v. Garden State Bar Assn.,* 457 U.S. 423, 432 (1982) (hereinafter *Middlesex*) would not require abstention even if there were exceptional circumstances that met the threshold established in *Sprint*. Under *Middlesex*, abstention is appropriate where there is an ongoing state judicial proceeding; the proceeding implicated important state interests; and the party seeking federal intervention had an adequate opportunity to raise constitutional issues in the state proceeding.  457 U.S. at 432.  However, these elements are no longer dispositive.  *Sprint*, 134 S.Ct. at 593.  Furthermore, all three elements must apply simultaneously.  See *Middlesex*, 457 U.S. at 432.

There is also no ongoing state judicial proceeding within the meaning of the *Middlesex* standard.  The Supreme Court has explicitly and forcefully adopted a narrow interpretation of what constitutes an ongoing state proceeding, holding that "[r]equiring the federal courts totally to step

aside when no state criminal prosecution is pending against the federal plaintiff would turn federalism on its head." *Steffel v. Thompson*, 415 U.S. 452, 472 (1974). This Court has also concluded that an expansive basis for abstention would abrogate the federal courts' duty to protect constitutional rights and create a perverse incentive for states to enforce a contested law to protect it from a successful challenge in federal court. *Cobb v. Beame*, 402 F.Supp. 19, 25 (S.D.N.Y. 1975). Both of these decisions align with the Supreme Court's current position that the *Younger* doctrine does not allow federal courts to abstain whenever there are parallel state and federal cases that implicate a state interest. See *Sprint*, 134 S.Ct. at 593.

Plaintiff is not seeking federal interference with a specific state court proceeding in which it is a named party. Instead, its Complaint calls upon the Court to "[p]ermanently enjoin [the] defendants from adjudicating incapacity and appointing guardians pursuant to Article 17A, until defendants ensure that the proceedings provide substantive and procedural rights" guaranteed by the Constitution and relevant federal statutes. Compl. p. 35. This is the exact type of lawsuit that both the Supreme Court and this Court sought to protect from an overly broad interpretation of the abstention doctrine. See *Steffel*, 415 U.S. at 472; *Cobb*, 402 F.Supp. at 25. Therefore, pending guardianship cases in Surrogate court are not ongoing state judicial proceedings that would justify abstention.

Additionally, *Middlesex* involved a challenge to the constitutionality of a state's attorney disciplinary proceedings. 457 U.S. at 425. The Supreme Court held that state attorney disciplinary proceedings "are of a character to warrant federal-court deference" because the state "has an extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses [and] the professional conduct of attorneys involved in the administration of criminal justice is of special importance" to the state. *Id.* at 434. Thus, the holding in *Middlesex* must be

limited to attorney disciplinary proceedings and similarly exceptional state interests that are not at issue in this action.

Finally, the Court should reject Defendants' reliance on *Middlesex* because failing to do so would require it to find that state proceedings offer an adequate opportunity to raise and receive a timely decision on its federal claims in state court.  See *Middlesex*, 457 U.S. at 432, 437.  The Defendants argue that this Court should abstain from ruling on the constitutionality of Article 17A, including its procedural due process protections, on the basis that Article 17A itself offers Plaintiff an adequate opportunity to address constitutional issues arising out of state guardianship proceedings.  Def. Mem. p. 11-12.  Through their circular argument, Defendants are attempting to litigate some of the merits of the case even as it argues for abstention.  *Id.*  In doing so, it inadvertently illustrates why the Court should not use the *Middlesex* test as a basis for abstention, in that by abstaining, a Court would be functionally ruling that the processes established under Article 17A adequately protects individuals' rights.

## II.   DRNY'S SECTION 1983 CLAIMS AGAINST CHIEF JUDGE JANET DIFIORE AND CHIEF ADMINISTRATIVE JUDGE LAWRENCE K. MARKS ARE NOT BARRED BY THE DOCTRINE OF SOVEREIGN IMMUNITY.

Defendants allege that Plaintiff is precluded from bringing its Section 1983 claims against the State and the UCS under the Eleventh Amendment doctrine of sovereign immunity. Defendants concede that DRNY's Section 1983 claims against Chief Judge Janet DiFiore and Chief Administrative Judge Lawrence K. Marks (collectively, the "Individual Defendants"), in their official capacity, are authorized under *Ex Parte Young*, 209 U.S. 123 (1908) to the extent that

DRNY is seeking prospective relief to prevent a continuing violation of federal law.[2]  *Id.* See also, Def. Mem., p. 14, FN 4.

*Ex Parte Young,* and its progeny, established that there is no Eleventh Amendment shield protecting state officials, sued in their official capacities, from suit under Section 1983, so long as the relief sought is to stop present or future wrongs and is prospective, rather than retrospective. *Id.* See e.g., *CSX Transp., Inc. v. New York State Off. of Real Prop. Services*, 306 F3d 87, 98 (2d Cir. 2002) (in determining whether the doctrine of *Ex Parte Young* permits suit, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."); *Reynolds v. Giuliani*, 118 F.Supp.2d 352, 381–82 (S.D.N.Y.2000) (finding "[p]laintiffs' claims ... [fell] squarely within the *Ex Parte Young* exception" where "Plaintiffs have named state officials, not the state itself, as defendants [;] allege that the state officials are violating and continue to violate federal laws, including the Fourteenth Amendment to the Constitution[; and] seek prospective injunctive relief, and not retroactive money damages, against the State defendants" (footnotes and internal citations omitted)).  State officials will only be protected from Section 1983 claims under the Eleventh Amendment where the relief sought is retrospective and/or is equivalent to a money judgment against the State.  See, *Goonewardena v. New York*, 475 F. Supp. 2d 310, 329–30 (S.D.N.Y. 2007)

Notably, DRNY's Section 1983 claims, as alleged in the Complaint, are limited to claims for non-monetary relief against the Individual Defendants in their official capacity.  As such, the only question before this Court is whether the relief sought against the Individual Defendants is

---

[2] Notably, Defendants have only alleged the defense of sovereign immunity with regard to DRNY's Section 1983 claims.  Defendants have not, and cannot, put forth the same defense with respect to DRNY's claims sounding in violations of Title II of the ADA and Section 504 claims because New York law is clear that Congress fully intended to abrogate state sovereign immunity here.  See e.g., *Tennessee v. Lane*, 541 U.S. 509 (2004); *Degrafinreid v. Ricks*, 417 F Supp. 2d 403, 411 (S.D.N.Y. 2006), on reconsideration, 452 F Supp. 2d 328 (S.D.N.Y. 2006).

*designed to prevent a continuing violation of federal law* and whether it is *prospective* in nature. *Id*. Here, the answer can only be in the affirmative.

First, an *ongoing violation* exists whenever a violation's detrimental impact continues into the present.  See, *Marino v. City Univ. of New York*, 18 F Supp. 3d 320, 333 (E.D.N.Y. 2014) See also, *Dwyer v. Regan*, 777 F.2d 825, 836 (2d Cir.1985).  In determining whether the relief is *prospective* under *Ex Parte Young*, courts are to focus on the "nature of [the] requested relief, not the label placed on it." See, *Fishman v. Daines*, 743 F Supp. 2d 127, 137 (E.D.N.Y. 2010)  *N.Y. City Health & Hosps. Corp. v. Perales*, 50 F.3d 129, 135 (2d Cir.1995).

Applying this test, the Supreme Court found that "a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury." See, *Quern v. Jordan*, 440 U.S. 440 U.S. 332, 3337 (1979), overruled on other grounds by *Hafer v. Melo*, 502 U.S. 21, 27 (1991).  In addition to injunctive relief, private parties may also seek declaratory relief and "notice relief" against state actors in their official capacity for present or future federal law violations. *Id*. See also, *Fishman v. Daines*, 743 F Supp. 2d at 138 (finding that a declaratory judgment that State policy is unlawful against state officials is not barred by the Eleventh Amendment).  "Notice relief" will not be barred by the Eleventh Amendment where the notice is ancillary to the grant of some other appropriate relief that can be "noticed." *Quern v. Jordan*, 440 U.S. 440 U.S. at 337 (finding that relief requiring State officials notify individuals of their future rights and the existence of an administrative procedure, to obtain past benefits, ancillary to a valid injunction, is prospective in nature and is not barred by the Eleventh Amendment.).

A straightforward analysis here reveals that *Ex Parte Young* permits jurisdiction over the individual defendants because of their role in the ongoing constitutional violations which result from the appointment of Article 17A guardianships. See, Compl. ¶ 3.  Specifically, under Chief Judge DiFiore and Chief Administrative Judge Marks' control, Surrogate Courts have taken, and continue to take, actions to implement and appoint Article 17A guardians. *Id.* ¶ 21-28. Also of import, Judge Marks rescinded eight forms used in Surrogate's Court guardianship proceedings and prescribed eight new, equally unconstitutional forms for use in Surrogate's Court guardianship proceedings in the courts of the State of New York.  *Id.* ¶ 28.

By way of this action, DRNY seeks relief requiring the individual defendants, as Chief Judge of the State and Court of Appeals and Chief Administrative Judge for the Courts of the State, to take future action to discontinue Article 17A guardianships which presently violates individuals' rights under the Fifth and Fourteenth Amendments, the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973 (Section 504). *Id.*  ¶¶ 145-203. The first prong of *Ex Parte Young* is therefore satisfied.

Likewise, DRNY's requested relief is purely prospective as it would require the Individual Defendants to take future action to prevent this present and future harm.   Here, DRNY is seeking:

1. A declaratory judgment that 17-A violates various federal and constitutional laws;

2. A permanent injunction notifying individuals subject to 17-A of their right to request modification or termination of their guardianship order,

3. A permanent injunction requiring that defendants, upon receiving such a request, promptly hold a proceeding regarding termination or modification of the order;

4. An enjoiner which permanently bars defendants from adjudicating incapacity and appointing guardians pursuant to 17-A, until defendants ensure that the proceedings provide substantive and procedural rights that do not violate the United States Constitution, the ADA, and Section 504, and which are not inferior to the substantive and procedural rights enjoyed by allegedly incapacitated persons in MHL Article 81 proceedings.

<u>See</u>, Compl. ¶ 34-35.  Since DRNY is not seeking monetary damages, nor retrospective relief, DRNY is entitled to the relief requested as against the Individual Defendants.[3]  Further, the "notice relief" requested is not barred by the Eleventh Amendment because the notice is "ancillary to the grant of some other appropriate relief that can be 'noticed.'" <u>See</u>, *Quern*, 440 U.S. at 337.  In other words, because the notice requested pertains to an ongoing violation and is accompanied by a valid request for an injunction and an enjoiner, it must stand.  DRNY's claims therefore withstand Defendants' sovereign immunity defense and Defendants' motion to dismiss must be denied.

## III.    THE COMPLAINT PLAINLY STATES A CLAIM THAT 17A VIOLATES THE EQUAL PROTECTION CLAUSE

### A.   Plaintiff Successfully Pleads an Equal Protection Violation

When asserting a violation of the Equal Protection Clause, a plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny." *Phillips v Girdich*, 408 F.3d 124, 129 (2d Cir. 2005).  Defendants assert that rational basis review is the applicable analytical standard for Plaintiff's Equal Protection claim.  Defendants are mistaken.   While rational basis analysis does apply to some equal protection claims, courts must "review with greater scrutiny classifications that disadvantage a suspect class or impinge upon the exercise of a fundamental right."  *Windsor v United States*, 833 F Supp 2d 394, 400 (S.D.N.Y. 2012), affd, 133 S Ct 2675 (2013) <u>citing</u> *Plyler v. Doe*, 457 U.S. 202, 216–17 (1982); *Lombard v Bd. of Educ. of City of New York*, 645 F Supp 1574, 1581 (E.D.N.Y. 1986) (rational basis permissible "[s]ince

---

[3] Although DRNY does not seek monetary damages with respect to its Section 1983 claims, DRNY preserves its right to seek attorney's fees under Section 1988 if the Court agrees that DRNY has meritorious claims under Section 1983. <u>See</u>, *Gagne v. Maher*, 594 F2d 336, 341–42 (2d Cir 1979), affd., 448 US 122 (1980).  <u>See also</u>, *Kentucky v. Graham, 473 U.S. 159, 170 (1985)*.

plaintiff is not a member of a suspect class, and there is no fundamental right at issue.").  The plenary nature of an Article 17A guardianship results in the termination of fundamental rights of a particular class of persons – individuals with intellectual and developmental disabilities. Therefore, the constitutionality of Article 17A warrants strict scrutiny. "With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." *Plyer v Doe*, 457 US 202, 217 (1982); See also *Brewer v West Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 756 (2d Cir. 2000); *Abreu v Callahan*, 971 F. Supp. 799, 806 (S.D.N.Y. 1997).

Fundamental rights  include:  the  right to privacy to engage in personal conduct without intervention from state government (*Lawrence v. Texas*, 539 U.S. 558, 578 (2003)); the right to refuse unwanted medical treatment (*Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 278 (1990)); and the right to make personal decisions regarding marriage, procreation, contraception, family relationships, child rearing, and education *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 851, (1992) citing *Casey v. Population Services International*, 431 U.S. 678, 685 (1977)).  New York State Surrogate's Courts acknowledge the impact of guardianship on fundamental rights.  See, e.g., *In re Guardian for Michelle M.*, 52 Misc 3d 1211(A) (Sur. Ct. Kings Cnty. 2016) ("Many decisions that define the essence of an individual, such as where and with whom she lives, whether she can travel, work, marry, engage in certain social activities, whether and how she manages her income and resources, and what medical treatment she undergoes or refuses, are removed from that individual, who will have lost the legal right and ability to govern her own affairs and participate in society without the approval of another); *In re Guardianship of B.*, 190 Misc 2d 581, 586 (N.Y. Sur. Ct. Tomkins Cnty. 2002)

(recognizing guardian's power over individual's fundamental right to privacy in issues of birth control).

Plaintiff's Complaint further alleges Defendants have no compelling state interest to subject only people with intellectual and developmental disabilities to a plenary guardianship scheme that results in the loss of fundamental rights. Compl. ¶ 25, 31; See also, *Brewer v West Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 756 (2d Cir. 2000) ("To pass strict scrutiny, the [statute] must consist of narrowly tailored measures that further compelling governmental interests.").  When measures are taken to create such classifications, those measures are typically "assessed in terms of whether [they] are necessary to further a compelling governmental interest, a standard that usually results in the invalidation of the measure under consideration." *Abreu v Callahan*, 971 F. Supp. 799, 806 (S.D.N.Y. 1997).

Indeed, the State interest asserted by Defendants is to provide "a more efficient and less costly alternative to Article 81" is simply not compelling. Def. Mem. at 17 - 18.  If efficiency and cost arguments could defeat a claim to due process, then the defense would defeat all due process claims.  The convenience of the individuals or corporations seeking guardianship of individuals with intellectual and developmental disabilities cannot justify the imposition of a plenary guardianship permanently terminating the individual's fundamental rights.  See *Tennessee v. Lane*, 541 U.S. 509, 532-533 (2004).

Moreover, Article 17A guardianships are not narrowly tailored to enact the State's *parens patriae* interests or any other compelling interest. Compl. ¶¶ 9, 19. Article 17A provides only for the imposition of plenary guardianship and fails to limit the powers of a guardians to the individual's specific impairments.   Article 17A is not a precisely tailored measure within the meaning of Equal Protection.  New York's Olmstead Commission admitted this and urged reform

14

of Article 17A to incorporate the functional assessment and tailoring requirements of Article 81. "…Article 17A does not limit guardianship rights to the individual's specific incapacities …" *Id.* In contrast, Article 81 – the guardianship scheme applicable to all other people with disabilities - "imposes guardianship based upon a functional analysis of a person's disability…", thus narrowly tailoring its exercise of its *parens patriae* interests. *Id.* For these reasons, Article 81 complies with due process and Article 17A does not, and consigning people with intellectual and developmental disabilities to Article 17A denies them the equal protection of the laws.

Plaintiff is not required to identify a "suspect class" of persons who are disadvantaged to warrant strict scrutiny by this Court. Def. Mem. at 19. Greater scrutiny is required when statutes are alleged to either "disadvantage a suspect class *or* impinge upon the exercise of a fundamental right." *Windsor v United States*, 833 F Supp 2d 394, 400 (emphasis added) (quoting *Plyer v Doe*, 457 U.S. 202 (1982). Because the plenary nature of Article 17A and its scant procedural protections deny individuals fundamental rights, the identification of a suspect class is not required. *Id.* Even if a suspect class were required, it would be met here. Congress has found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem…," and that "individuals with disabilities continually encounter various forms of discrimination, including … *exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."* 42 U.S.C. § 12101 (emphasis added). The legal landscape has shifted and *City of Cleburne v. Clemburne Living Ctr.,* 473 U.S. 432 (1985), which predated Congress' findings when enacting the ADA, is no longer controlling.

B.  <u>Plaintiff Plausibly Alleges Defendants Purposefully Discriminate Against
Individuals with Intellectual and Developmental Disabilities</u>

To state a claim under the equal protection component of the Due Process Clause, a plaintiff

must show that he was treated differently than others similarly situated as a result of intentional or

purposeful discrimination.  *Phillips v. Girdich*, 408 F.3d 124,129 (2d Cir. 2005) .  Plaintiff meets

this burden.  Compl. ¶ 6.  Plaintiff's complaint details the significant distinctions between New

York's two guardianship schemes.  Compl. ¶¶ 4-23.  Only individuals with intellectual and

developmental disabilities are subject to Article 17A plenary guardianship and its substantially

inferior due process protections. *Id.;* <u>See also</u>, §§1750, 1750-A.  Article 17A is based on the

discriminatory premise that the presence of an intellectual or developmental disability renders a

person incompetent to make decisions in all aspects of life.  In contrast, under Article 81, regardless

of the origin of the disability, individuals are assumed to have capacity and will retain decision

making authority unless clear and convincing evidence demonstrates an area of functional

disability requiring guardianship. Compl. ¶ 6.   As stated in the preceding section, there is no

compelling purpose to deny people with intellectual and developmental disabilities the protections

of Article 81.  Rather, Article 17A is based on "the stereotypical thought processes" that people

with intellectual and developmental disabilities should be treated differently.   *U.S. Airways, Inc.*

*v. Barnett*, 535 U.S. 391, 401 (2002)

In 1990, the State observed:

[S]ince this statute was enacted in 1969, momentous changes have occurred in the care,
treatment and understanding of these individuals. Deinstitutionalization and community-
based care have increased the capacity of persons with mental retardation and
developmental disabilities to function independently and make many of their own
decisions. These rights and activities which society has increasingly come to recognize
should be exercised by such persons to the fullest extent possible…

Compl. ¶¶. 5 – 6.

16

Therefore, Plaintiff has alleged purposeful conduct because that Defendants have been aware of the right of people with intellectual and developmental disabilities to be evaluated based upon their functional abilities and did not take steps to correct Article 17A. Accordingly, Plaintiff has plausibly asserted that individuals with intellectual and developmental disabilities "are treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d at 129.  For the foregoing reasons, Plaintiff has successfully pled the requisite elements of a violation of the Equal Protection clause of the Fourteenth Amendment.

## IV.     THE COMPLAINT ALLEGES VIOLATIONS OF THE ADA AND REHABILITATION ACT

Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2012). To state a claim for injunctive relief under Title II, a plaintiff must demonstrate that (1) she is a qualified individual with a disability; (2) the defendant is subject to the ADA; and (3) plaintiff was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant, by reason of her disabilities. *Noel v. N.Y.C. Taxi & Limousine Comm'n,* 687 F.3d 63, 68 (2d Cir.2012). These requirements apply with equal force to Plaintiff's Section 504 claims. <u>See</u> *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir.1999) ("Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements, we consider these claims in tandem.") (*citing Lincoln Cercpac v. Health & Hosps. Corp*., 147 F.3d 165, 167 (2d Cir.1998)).

A. Qualified Individuals with Intellectual and Developmental Disabilities

Only people alleged to have intellectual and developmental disabilities are subjected to Article 17A guardianships, and thus they are regarded as disabled. The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A); 29 U.S.C. § 705(9)(B); See also ADA Amendments Act, Pub. L. No. 110-325, § 2, 122 Stat. 3553, 3553-55 (2009) (providing a nonexclusive list of "major life activities"). The definition of disability must be construed in favor of broad coverage of individuals under the ADA. 42 U.S.C. § 12102(4)(A) (reinforcing congressional intent to provide broad coverage under the ADA, and explicitly rejecting several aspects of the Supreme Court's decisions limiting coverage). Congress made clear that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id.*

Article 17A requires that a petition for guardianship must be supported by two physicians or a physician and a psychologist who certify the person to be intellectually or developmentally disabled. Consequently, the Defendants regard those subjected to Article 17A guardianships as a person with a disability. Plaintiffs have sufficiently pleaded that where an Article 17A guardianship is sought, the person involved is either a person with an intellectual and/or developmental disability or is regarded as such by the Defendants for the purpose of the proceeding. Compl. ¶¶ 48, 50.

A "qualified individual with a disability" is defined as "an individual with a disability who … meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *United States v. Georgia*, 546 U.S. 151, 153–54 (2006) (quoting 42 U.S.C. § 12131). Article 17A prescribes that individuals with intellectual and developmental disabilities will be placed under guardianships because of their diagnosed

18

disabilities if it is in their best interest. Compl. ¶¶ 48, 50. Therefore, the diagnosis of intellectual and developmental disability is the essential eligibility requirement of Article 17A.

Accordingly, Plaintiff has sufficiently pleaded that people with intellectual and developmental disabilities subject to Article 17A proceedings are qualified individuals with disabilities under the ADA and Section 504. Compl. ¶176-203.

### B.   Defendants Are Public Entities Subject to Title II of the ADA and Section 504

Plaintiff has pled, and Defendants do not dispute, that the State and the UCS are public entities subject to Title II of the ADA and Section 504. Compl. ¶14-16; Defendant's Answer to Pl. Compl. ¶15. The UCS is the judicial arm of the State. Compl.¶ 195. The UCS receives federal assistance in the form of grants which it distributes to programs it administers and is therefore a covered public entity under Section 504. Compl. ¶¶ 196-197

### C.   The Article 17A Guardianship Process is a Service, Program or Activity

Plaintiff has also sufficiently pled that Article 17A is a public "service, program, or activity" within the meaning of the ADA. The Supreme Court has determined that Title II covers all programs, services, and activities of governmental entities "without any exception." See *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998) (noting that the ADA covers all state activities including the administration of state prisons, and includes "services" provided "involuntarily" to prisoners and pre-trial detainees) (emphasis in original) See also *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 44-45 (2d Cir. 1997) , superseded by statute 42 U.S.C. § 12188(a) (This language in Title II's anti-discrimination provision is "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context…"). The ADA is intended to address a broad range of governmental activities in order to eliminate disability-based discrimination. See

28 C.F.R. pt. 35, app. A, subpart A ("[T]itle II applies to anything a public entity does," and applies to all governmental activities of executive agencies, as well as those of the legislative and judicial branches of state and local governments, "even if they are carried out by contractors."); 28 C.F.R. § 42.540(j) (defining "[b]enefit" to include the "provision of services, financial aid or disposition, (i.e., treatment, handling, decision, sentencing, confinement, or other prescription of conduct)").

The Defendants are exercising *parens patriae* authority by entering a court order that divests the individual of crucial decision-making rights and appoints a surrogate to make decisions for the individual. The Second Circuit Court of Appeals, under similar facts, concluded that the State process for appointing a durable power of attorney was a "program or activity" within the meaning of the ADA and Section 504.  See *Hargrave v. Vermont*, 340 F. 3d 27 (2d Cir. 2003) ("[T]he statutorily created opportunity to execute a [durable power of attorney] for health care and the right to have it recognized and followed," was a service, program or activity" of the public entity.") The Court states, "the specific language of [28 C.F.R.] section 35.130(b)(7) makes clear that the 'service, program, or activity' at issue is neither Vermont's entire civil commitment program nor the specific procedures set forth in [Vermont's durable power of attorney override law], but rather Vermont's program of permitting its citizens to execute" durable powers of attorney. *Id.*

Like *Hargrave*, Defendants, through Article 17A, have statutorily created a transfer of decision-making rights to a guardian, which is then legally recognized by third parties. Compl. ¶53. This action is properly characterized as a public entity "service, program or activity" within the meaning of the ADA.

D. <u>Defendants Discriminate By Denying the Benefit of a Program</u>

Plaintiff has asserted that the Defendants' process for placing a person with an intellectual and developmental disability under an Article 17A guardianship is discriminatory because the statute does not consider "the least restrictive form of intervention in determining the need for a guardian" (Compl.¶ 117) and uses a standard for appointment which presents "greater barriers to an individuals' full participation in society or enjoyment of their rights and liberties." Compl. ¶186, 201. Defendants' conduct is discriminatory because it denies the benefits of Article 81 protections to people subject to Article 17A guardianships based on "the stereotypical thought processes" that people with intellectual and developmental disabilities should be treated differently and worse." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002).

Plaintiff has asserted that by failing to consider the functional abilities of a person subject to an Article 17A guardianship, failing to tailor the guardianship to the least restrictive form of intervention, and failing to afford individuals the other procedures and protections afforded to other individuals with disabilities through Article 81 that Defendants deprive individuals with intellectual and developmental disabilities of the benefits of the protections of Article 81.

The Defendants claim that Article 17A is necessary because it is "a more efficient and less costly alternative to Article 81." Def. Mem. p. 18. However, Plaintiff asserts that the proceeding is only efficient and less costly because it deprives individuals with intellectual and developmental disabilities of due process and permits the appointment of a guardianship without consideration for the functional abilities of a person with an intellectual and/or developmental disabilities. Compl.¶¶ 146-153, 155-165.  Furthermore, the duty to accommodate is perfectly consistent with the well-established due process principle that, "within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard" in its courts. *Boddie v. Connecticut,*

401 U.S. 371, 379 (1971) The Supreme Court has recognized a number of affirmative obligations that flow from this principle including that "the ordinary considerations of cost and convenience alone cannot justify a State's failure to provide individuals with meaningful right of access to the courts." See *Tennessee v. Lane*, 541 U.S. 509, 532-533 (2004).

      E.   Animus or Comparation Class is not required for Plaintiff's ADA and Section 504 Claims

Title II of the ADA and Section 504 do not require a showing of animus. Defendants' argument that intentional discrimination requires a showing of animosity or ill will is therefore meritless. Plaintiffs are not asserting claims for money damages so deliberate indifference is not relevant to this proceeding.   Not even cases seeking money damages under the ADA and 504 require personal animosity.  See *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir.2009) (holding that intentional discrimination for money damages under [Section 504 of] the Rehabilitation Act does not require personal animosity or ill will, but rather merely requires a showing of deliberate indifference to likely violations of federal law), and *Gershanow v. Cnty. Of Rockland*, 2014 WL 1099821, at 4 (S.D.N.Y. 2014) (citing *Loeffler* for the proposition that deliberate indifference is the standard for intentional discrimination for money damages under the ADA and not personal animosity or ill will).

The ADA evolved from an attempt to remedy the effects of benign neglect resulting from the invisibility of people with disabilities. Congress did not limit the Act's protections and prohibitions to circumstances involving deliberate discrimination. Such discrimination arises from affirmative animus which is not the focus of the ADA or Section 504.

In *Alexander v. Choate,* 469 U.S. 287 (1985) the Supreme Court emphasized the factors which led to enactment of Section 504:

> Discrimination against the handicapped was perceived by Congress to be most often the product, *not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect....* Federal agencies and commentators on the plight of the handicapped similarly have found that *discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus.*

*Choate,* 469 U.S. at 295 (emphasis added) (citations and footnotes omitted)

The ADA attempts to eliminate the effects of "benign neglect," "apathy," and "indifference."

In fact, the ADA was founded on the explicit Congressional recognition that while individuals with disabilities have the ability, and should have the right, to fully participate in all aspects of social life, often they are precluded from doing so because of discrimination in various forms, including "outright intentional exclusion, [and] *the discriminatory effects of . . .* communication barriers, *overprotective rules and policies . . . .*" 42 U.S.C. § 12101 (Emphasis added). In this way, the ADA differs from prior legislation by clearly identifying the effect of overprotective rules and policies of persons with disabilities as a type of discrimination that Congress sought to eliminate. "The statute seeks to diminish or to eliminate the stereotypical thought processes, the thoughtless actions, and the hostile reactions that far too often bar those with disabilities from participating fully in the Nation's life ...." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002).

Defendants also wrongly assert that discrimination under the ADA and Section 504 require people with disabilities to demonstrate disparate treatment when compared with people without disabilities.[4] The Courts have repeatedly rejected this interpretation of the ADA. The Supreme Court in *Olmstead v. L.C.* rejected arguments that the ADA only prohibits discrimination where

---

[4] Defendants cite several Title I cases and *Traynor v. Turnage*, 485 U.S. 535 (1988), a pre-ADA case, to support this theory. *Traynor* was also cited by the dissent in *Olmstead v. L.C.* but rejected by the majority as the standard for evaluating Title II ADA cases.

the parties can assert a comparison class of similarly situated individuals given preferential treatment. 527 US 581 (1999).  Instead, "the Court recognize[d] that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA." See *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 583 (1999) See also *Helen L. v. DiDario*, 46 F.3d 325,336 (3d Cir. 1995) ("[I]f Congress were only concerned with disparate treatment of the disabled as compared to their nondisabled counterparts," then the ADA's reference to the persistence of discrimination in institutionalization would constitute a "non sequitur"). Moreover, the ADA and 504 regulations make clear that the way that a public entity administers the provision of public services may itself be a basis of discrimination within the meaning of those statutes, independent of the discrimination that arises when individuals with disabilities receive different services than those provided to individuals without disabilities. 28 C.F.R. § 35.130.

Plaintiff need not plead a comparison class of people without disabilities. People subject to guardian proceedings may not be disabled at all, instead, they may be regarded as people with disabilities. These individuals are "alleged" to have an impairment or disability that incapacitates them and requires a guardian. Clearly, some of these petitions will be dismissed because there is no disability at all and for that reason the guardianship is denied. In Article 17A proceedings, respondents have a particular diagnosis (intellectual or developmental disability) and the mere allegation of those disabilities subjects them to a judicial proceeding which does not guarantee due process. Therefore, but for the diagnosis of an intellectual or developmental disability, due process would be a right.

Finally, Defendants assert that since a person with intellectual and developmental disability may be subjected to Article 81, then there is no "denial by the Defendants of an alleged incapacitated person's purported right to a guardianship proceeding governed by Article 81." Def.

Mem. p. 21. This proposition presupposes that people with intellectual and developmental disabilities are selecting the forum of an Article 17A guardianship over an Article 81 guardianship. Plaintiff has pleaded to the contrary. Compl. ¶ 183. A person with a disability has no ability to opt out of an Article 17A proceeding and opt into an Article 81 proceeding.

Moreover, Plaintiff does not claim that Defendants are depriving the rights of individuals with intellectual and developmental disabilities who have access to an Article 81 proceeding. Plaintiff is not asserting that the Defendants are discriminating against every person in New York with intellectual or developmental disabilities. Instead, Plaintiff asserts the thousands of persons with intellectual or developmental disabilities who undergo Article 17A proceedings are being deprived of rights. Compl. ¶¶ 2, 54, 83, 150, 201.  Plaintiff asserts that the Defendants administer Article 17A in a discriminatory fashion by failing to afford individuals with intellectual and developmental disabilities the protections and procedures within Article 81 because they have intellectual and developmental disabilities that qualify them for Article 17A proceedings. Compl. ¶¶ 184, 201.

F.   The State Prior Statements Find That Article 17A Violates the ADA

The State has determined that Article 17A violates the ADA and the State's obligations to administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.[5]  In November of 2012, Governor Andrew Cuomo

---

[5] Acting pursuant to a specifically delegated authority, the Attorney General has issued regulations implementing Title II of the ADA. Among these is the regulation, referred to as the "integration mandate," which requires that public entities "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." The "most integrated setting" is defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible. . . ." Public entities must make reasonable modifications in policies, practices, or procedures to avoid disability-based discrimination, unless those modifications would "fundamentally alter" the service, program, or activity at issue. In order to assert that a modification fundamentally alters

established the Olmstead Cabinet to address the State's Olmstead obligations under the ADA[6].

Executive Order 84, which Governor Cuomo used to create the Olmstead Cabinet, provided that:

> The Cabinet shall be comprised of the Governor's Deputy Secretary for Health/Director of Healthcare Redesign; the Counsel to the Governor; the Director of the Budget; the Commissioner of Developmental Disabilities; the Commissioner of Health; the Commissioner of Labor; the Commissioner of Transportation; the Commissioner of Mental Health; the Commissioner of Alcoholism and Substance Abuse Services; the Commissioner of Children and Family Services; the Commissioner of Homes and Community Renewal; the Commissioner of Temporary and Disability Assistance; the Director of the State Office for the Aging; and the Chair of the Commission on Quality of Care and Advocacy for Persons with Disabilities. Additional members may be appointed to the Cabinet at the discretion of the Governor. Executive Order 84 Section B(2).

In October 2013, the State issued an integration plan. Compl. ¶ 55. The creation of the Olmstead Plan involved meeting with over 160 stakeholder organizations, reviewing more than a hundred position papers, and obtaining input from hundreds of state employees across dozens of the State's organizations. Compl. ¶ 55. See also Executive Order 84.

The plan concluded that "[u]nder Article 17A, the basis for appointing a guardian is diagnosis driven and is not based upon the functional capacity of the person with disability." Compl.¶ 56.  In contrast, Article 81, "imposes guardianship based upon a functional analysis of a person's disability…" Compl. ¶ 57. The State integration plan states that Article 17A must be amended to include an examination of functional capacity and consideration of choice and preferences in decision making. Compl. ¶ 58.  The plan concludes:

> Community integration includes the ability of people with disabilities to make their own choices to the maximum extent possible. Guardianship removes the legal decision-making authority of an individual with a disability and should, consistent with Olmstead, only be

---

the state's service, program or activity the state must develop an integration plan (also called an Olmstead Plan).

[6] See Governor Andrew Cuomo's Executive Order 84 (November 30, 2012): http://www.governor.ny.gov/news/no-84-establishing-olmstead-plan-development-and-implementation-cabinet

imposed if necessary and in the least restrictive manner… Article 17A does not limit guardianship rights to the individual's specific incapacities, *which is inconsistent with the least-restrictive philosophy of Olmstead.* New York Olmstead Cabinet, Report and Recommendations of the Olmstead Cabinet (2013), 28. (emphasis added)

The State's assertions in this motion that Article 17A does not violate the ADA run contrary to the State's prior assertions made after the lengthy Olmstead Cabinet process.

## V.    PLAINTIFF HAS SUFFICIENTLY PLEADED A FACIAL CHALLENGE TO ARTICLE 17A

A facial challenge is a legal claim alleging a law is unconstitutional on its face. *United States v. Stevens*, 559 U.S. 460, 472 (2010).  In this case Plaintiff asserts the constitutional rights of persons with disabilities who are subject to Article 17A guardianship proceedings are violated. Compl. ¶¶ 145-203. Specifically, Plaintiff alleges Article 17A, on its face, fails to meet the constitutional requirements of substantive due process and procedural due process when applied in substantial number of guardianship proceedings. Compl. ¶¶ 145-175. Furthermore, Plaintiff claims all applications of Article 17A to persons with disabilities violate their fundamental rights under equal protection. Compl. ¶¶ 166-175.

Citing *U.S. v. Salerno* 481 U.S. 739, 745 (1987), Defendants assert Plaintiff's facial challenge to Article 17A must fail because Plaintiff cannot show that every application of the statutory scheme is invalid. Def. Mem. p. 23.  Defendants plainly misapprehend *Salerno* and subsequent case law, including decisions of the U.S. Supreme Court. The U.S. Supreme Court stated that  the standard asserted in *Salerno* was dicta and is not the "decisive factor" for assessing facial challenges. *City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22 (1999) (plurality opinion) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including

*Salerno* itself."); <u>See also</u>, *Doe v City of Albuquerque*, 667 F3d 1111, 1125–26 (10th Cir 2012); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 405 (S.D.N.Y. 2015) ("there is ample precedent supporting the [District] Court's ruling [that plaintiff need not show every application of the challenged law], including some cases suggesting that Salerno is no longer the governing standard for facial challenges at all").

Even if this Court were to apply the test articulated in *Salerno* -- that there are no set of circumstances under which Article 17A would be valid -- Plaintiff's pleadings must still survive Defendants' motion.  Specifically, Plaintiff asserts in its Complaint that Article 17A violates substantive and procedural due process, as well as the fundamental rights of people with intellectual and developmental disabilities under the Equal Protection clause of the Fourteenth Amendment.  Compl. ¶¶ 166-175.  Because Article 17A is unconstitutional, no application of Article 17A would be valid. *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir.2012) (a party making a facial challenge must show that "no set of circumstances exists under which the statute would be valid, i.e., that the law is unconstitutional in all of its applications, or at least that it lacks a plainly legitimate sweep" (internal quotation marks and brackets omitted)); *Bruni v City of Pittsburgh*, 824 F3d 353, 363 (3d Cir 2016) ("The Court has often considered facial challenges simply by applying the relevant constitutional test to the challenged statute, without trying to dream up whether or not there exists some hypothetical situation in which application of the statute might be valid."); *Doe v City of Albuquerque*, 667 F3d 1111, 1122 (10th Cir 2012) ("The proper framework to apply in a facial challenge is not to require the challenger to disprove every possible hypothetical situation in which the restriction might be validly applied, but rather to apply the appropriate constitutional test to determine whether the challenged restriction is invalid on its face (and thus incapable of any valid application)").

Indeed, applying the appropriate constitutional test to the challenged law is precisely what the Second Circuit Court of Appeals did in *United States v Decastro* (682 F3d 160, 168–69 (2d Cir 2012)), a case upon which Defendants rely.  The *Decastro* Court held that if a statute clearly burdens a fundamental right, it may be facially challenged.  It is only if the statute is found not to burden a fundamental right that the plaintiff must show no set of circumstances exist under which the statute would be valid. *Id.* at 168–69 (internal citations omitted); see also, *Doe v. City of Albuquerque*, 667 F.3d 1122 (the court should "apply the appropriate constitutional test to determine whether the challenged [statute] is invalid on its face."); *Congregation Rabbinical Coll. of Tartikov, Inc. v Vil. of Pomona*, 138 F Supp 3d 352, 404 (S.D.N.Y. 2015) quoting *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F.Supp.2d 574, 613, n.18 (S.D.N.Y.2013) ("The *Salerno* test would be met if the Challenged Laws violate Plaintiffs' Equal Protection or Free Exercise rights because 'a law that violates the Equal Protection Clause or the Free Exercise Clause will be invalid when applied under any conceivable circumstance, even if it can be justified by a conceivably benign motive.'").

Applying the same analysis, Plaintiff has sufficiently pled a facial challenge.  Plaintiff alleges Article 17A violates fundamental rights protected by the Fifth and Fourteenth Amendments of the U.S. Constitution, rendering Article 17A invalid in all its applications.  Compl. ¶¶ 166-175.  Assuming the constitutional violations are true, as the Court must in deciding the current motion, every application of Article 17A would be invalid.  See *United States v Decastro*, 682 F3d at 168–69.

Nevertheless, Defendants fruitlessly attempt to escape the inherent unconstitutionality of Article 17A by asserting that New York Surrogate judges "regularly take steps to ensure fairness and avoid the purported constitutional issues identified in the Complaint."  Def. Mem. p. 24.

Defendants then cite several cases in which New York Surrogates have applied protections to ensure the application of the statute is more consistent with fundamental constitutional protections. Def. Mem. p. 23–27.  It is certainly true that Article 17A's constitutional infirmities are recognized by some Surrogate Courts.  *In re Guardianship of Dameris L.*, 956 N.Y.S.2d 848, 38 Misc.3d 570 (N.Y. Sur. Ct.. N.Y. Cnty. 2012) (Failure to tailor 17A guardianships violates substantive due process); *In re Mark C.H.*, 906 N.Y.S.2d 419, 28 Misc. 765 (N.Y. Sur. Ct. N.Y. Cnty. 2010) (Failure to require periodic reporting by guardian violates due process);  *In re Chaim A.K.*, 885 N.Y.S.2d 582, 26 Misc. 2d 837 (N.Y. Sur. Ct. N.Y. Cnty. 2009) (Failure to tailor powers of guardian as is done in MHL Article 81 violates Equal Protection clause);  *In re Guardianship of B.*, 738 N.Y.S.2d 528, 190 Misc.2d 581 (N.Y. Sur. Ct. Tomkins Cnty. 2002) ("The equal protection provisions of the federal and state constitutions would require that mentally retarded persons in a similar situation be treated the same whether they have a guardian appointed under Article 17–A or Article 81.").  However, scattered and inconsistent attempts to correct such defects does not cure the constitutional violations of Article 17A or somehow render it facially valid, nor are Surrogate Courts required to do so.  As the Defendants concede, it is a "fundamental principle of judicial restraint that courts should not anticipate a question of constitutional law in advance of the necessity of deciding it . . .".  Def. Mem. p. 24 <u>citing</u> *Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010).  Under this standard, Surrogate Courts should not be "taking steps" to correct "purported Constitutional issues".  <u>See,</u> Def. Mem. p. 24.

Surrogate Courts, too, recognize that there is a limit to reading protections into Article 17A. *In re Guardianship of J. H.*, 896 N.Y.S.2d 662, 666, 27 Misc.3d 705, 707 (N.Y. Sur. 2010). Indeed, State law prohibits judges from correcting statutory defects beyond the expressed judicial function of statutory interpretation.

> A court cannot by implication supply in a statute a provision which it is reasonable to suppose the Legislature intended intentionally to omit; and the failure of the Legislature to include a matter within the scope of an act may be construed as an indication that its exclusion was intended.

N.Y. STAT § 74 [McKinney].

> The courts in construing statutes should avoid judicial legislation; they do not sit in review of the discretion of the Legislature or determine the expediency, wisdom, or propriety of its action on matters within its powers.

N.Y. STAT § 73 [McKinney].

Inasmuch as Defendants and New York Surrogates admit Article 17A requires arguably impermissible ad hoc judicial legislation to survive constitutional scrutiny, Defendants have no basis to claim these isolated applications somehow cure Article 17A's inherent constitutional defects.  Accordingly, Plaintiff's facial challenge pleading must prevail.

## VI.   CHIEF JUDGE DIFIORE AND CHIEF ADMINISTRATIVE JUDGE MARKS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants also erroneously allege that Chief Judge Janet DiFiore and Chief Administrative Judge Lawrence K. Marks, who have been sued in their official capacity, *only,* are shielded from liability on grounds of qualified immunity.

Qualified immunity protects state officials sued in their *individual capacities* "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." See, *Jackler v. Byrne*, 658 F3d 225, 242 (2d Cir. 2011), *quoting, Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To the contrary, and quite relevant here, qualified immunity is not a defense available to a claim against a state official, sued in his *official capacity*. See, *Kentucky v. Graham,* 473 U.S. 159, 167 (1985) (finding qualified immunity is not an available defense for a governmental official sued in his

official capacity.); *Frank v. Relin*, 1 F3d 1317, 1327 (2d Cir. 1993) ("Qualified immunity is not a defense to a claim against a municipal official in his official capacity."). Here, the Second Circuit has held that claims "asserted against a government official in his official capacity is essentially a claim against the governmental entity itself" and thus "the defense of qualified immunity, which may be available to individual defendants as they are sued in their individual capacities, is not applicable to claims against them in their official capacities." See, *Jackler*, 658 F3d at 244. (finding "even if the court were eventually to determine that defendants are entitled to qualified immunity on the claims against them in their individual capacities, that determination would not entitle them to dismissal of the official-capacity claims.").[7]

Even if the Court were to overlook this fatal flaw, qualified immunity is an affirmative defense and Defendants have the burden of proof to demonstrate that the Individual Defendants' conduct did not violate clearly established law and that it was *objectively reasonable* for them to believe that their conduct was lawful.  See*, Matthews v. City of New York*, 889 F Supp. 2d 418, 432 (E.D.N.Y. 2012), citing, *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir.2007); See also, *Barboza v. D'Agata*, 151 F. Supp. 3d 363, 369 (S.D.N.Y. 2015). It is therefore incumbent upon the Defendants to "plead, and adequately develop, a qualified immunity defense during pretrial proceedings." *Id.*; See also, *Shechter v. Comptroller of City of New York*, 79 F3d 265, 270 (2d Cir. 1996) ("Qualified immunity is an affirmative defense that must be pled and proved by the defendant.").  Further, "[a]ffirmative defenses which amount to nothing more than mere conclusions of law and are not warranted by any asserted facts have no efficacy." *Field Day, LLC v. County of Suffolk*, 799 F. Supp. 2d 205, 214 (E.D.N.Y. 2011).

---

[7] While Defendants heavily rely on *Vives v. City of New York*, 405 F.3d 115 (2d. Cir. 2003) to support their argument for qualified immunity, this case is not applicable to the case at bar.  In *Vives,* the Second Circuit considered whether police officers performing discretionary functions were protected from liability in their individual capacity under qualified immunity.

Because this *objectively reasonable* test is fact intensive and specific, the Second Circuit has established a strong preference to consider this issue after discovery. See *e.g.*, *Looney v. Black*, 702 F.3d 701, 720 (2d Cir.2012) (finding a determination on qualified immunity premature on motion to dismiss); *Taylor v. Vermont Dept. of Educ*., 313 F.3d 768, 793 (2d Cir.2002) (finding ruling on availability of the qualified immunity defense would be premature where ruling turned on factual questions that could not be resolved at motion to dismiss stage before discovery). That said, New York Courts will typically deny a defendant's motion to dismiss which asserts a qualified immunity defense when said motion is filed before discovery.  See *e.g., Hamilton v. Fisher*, No. 10–CV–1066, 2012 WL 987374, at * 19 (N.D.N.Y. Feb. 29, 2012) (finding that "any adjudication as to the applicability of the qualified immunity affirmative defense would be premature since '[r]esolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation.' ") (quoting *Denton v. McKee*, 332 F.Supp.2d 659, 666 (S.D.N.Y.2004); *Taylor v. Wilde*, No. 11–CV–3608, 2012 WL 2860999, at *4 (E.D.N.Y. 2012) (declining to dismiss complaint on qualified immunity grounds on motion to dismiss); *Maloney v. Cnty. of Nassau*, 623 F.Supp.2d 277, 292 (E.D.N.Y.2007) ("Because this defense necessarily involves a fact-specific inquiry, it is generally premature to address the defense of qualified immunity in a motion to dismiss.").

Accordingly, Defendants argument for qualified immunity fails from the outset and should be rejected in its entirety. As Defendants have attempted to shield the Individual Defendants, sued in their official capacity, with a protection only available to state officials who have been sued in their personal capacity, this Court need not make a determination on the merits.  Further, even if Defendants' bald assertions were relevant here, Defendants' motion must be denied as premature and for failure to adequately plead and develop their qualified immunity affirmative defense.

**CONCLUSION**

For all the above reasons, this Court should deny Defendants' Motion to Dismiss on the Pleadings.

Dated:  Albany, New York                    Respectfully submitted,

      July 21, 2017                              By: /s/ Jennifer J. Monthie

                                                     DISABILITY RIGHTS NEW YORK
                                                     Attorneys for Plaintiff
                                                     Jennifer J. Monthie
                                                     725 Broadway, Suite 450
                                                     Albany, New York 12207
                                                     (518) 432-7861 (telephone)
                                                     (518) 427-6561 (fax) (not for service)
                                                     jennifer.monthie@drny.org